**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
Southern Division**

| | | |
|---|---|---|
| JACQUELINE VALRIE, individually and on behalf of all similarly situated individuals, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 1:11-cv-00404-CG-N |
| NATIONSTAR MORTGAGE, LLC, | ) ) | |
| Defendant. | ) ) | |

**NATIONSTAR MORTGAGE, LLC'S MEMORANDUM OF LAW
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Defendant Nationstar Mortgage, LLC ("Nationstar"), by counsel, respectfully submits the

following Memorandum of Law in Support of its Motion for Summary Judgment.  In support

thereof, Nationstar states the following:

## INTRODUCTION

Jacqueline Valrie's ("Plaintiff") mortgage loan is currently owned by the Federal

National Mortgage Association ("Fannie Mae"), and has been owned by Fannie Mae since 2003.

Nationstar has been the servicer, and only the servicer, of this loan since 2008.  These are facts

of which there is no genuine dispute and are dispositive of the claim in Plaintiff's one-count

Complaint.

In her Complaint, Plaintiff alleges Nationstar is liable under § 1641(g) of the Truth in

Lending Act ("TILA") for an alleged failure to inform Plaintiff that it purportedly became the

"new owner" of her loan in 2010.  Plaintiff alleges Nationstar became the "new owner" through

a September 2010 "Assignment of Deed of Trust" (the "Assignment") from the Mortgage

Electronic Registration System, Inc. ("MERS") to Nationstar, in which MERS purportedly

transferred its interest in Plaintiff's mortgage and note to Nationstar.  Plaintiff's theory, however, is belied by the undisputed facts of the case.

- First, § 1641(g) requires that an entity that becomes the "new owner" of a *loan* (as opposed to the mortgage securing the loan) inform the borrower of that fact.  MERS has never owned Plaintiff's loan.  It was, therefore, factually and legally impossible for MERS to transfer ownership of Plaintiff's loan to Nationstar through the Assignment.  MERS cannot transfer what it does not have.

- Second, Fannie Mae has been the continuous and uninterrupted owner of Plaintiff's loan since 2003.  Since Fannie Mae has never been divested of its ownership, Nationstar never became the loan's "new owner."

- Third, Nationstar has *only* serviced the Plaintiff's loan *on behalf* of Fannie Mae since 2008.  This point is corroborated by all of the evidence produced in discovery, including the Assignment document itself, which was prepared solely for the purpose of instituting foreclosure on behalf of Fannie Mae.

- Fourth, even if Nationstar had acquired an ownership interest in Plaintiff's loan, which it did not, there is an exception to § 1641(g) for servicers who acquire an interest in the loan "solely for the administrative convenience of the servicer in servicing the obligation." 15 U.S.C. § 1641(f)(2).  Any interest Nationstar allegedly acquired was solely for the purpose of conducting a foreclosure on behalf of Fannie Mae.  Therefore, Nationstar is entitled to § 1641(f)(2)'s safe harbor.

Despite the newness of § 1641(g), there is analogous case law from two federal district courts, including one in Alabama, supporting summary judgment for Nationstar.  *See Knowles v. HSBC Bank USA*, No. CV-11-J-1953-S, 2012 U.S. Dist. LEXIS 79865 (N.D. Ala. June 8, 2012)

(holding that an assignment does not trigger § 1641(g) obligations if the assignor does not have an interest in the note to assign); *Che v. Aurora Loan Services, LLC*, No. SACV 11-01458-CJC, 2012 U.S. Dist. LEXIS 51642 (C.D Cal. Mar. 15, 2012) (holding that an assignment of the deed of trust from MERS to the servicer, and possession of the note by the servicer, did not trigger § 1641(g) obligations).   In contrast, Plaintiff's claims are entirely lawyer-driven[1] and seek to impose liability on a servicer never contemplated by the drafters of § 1641(g).   In fact, adopting Plaintiff's theory requiring *servicers* in Nationstar's position to wrongly inform borrowers that they are the "new owner" of the loan would undermine the purposes of § 1641(g) by confusing borrowers as to the loan's true owner.   Accordingly, the Court should grant Nationstar's Motion for Summary Judgment.

## UNDISPUTED FACTS ("SOF")[2]

### Loan Origination

1.      In a residential real estate transaction, two documents take center stage – the promissory note and the mortgage (in Alabama).   Although related, they both perform different functions with respect to the loan.   The note evidences the loan's existence and the borrower's promise to repay the loan's proceeds, whereas the mortgage "creates the lien on the real property that secures the note."   In the mortgage, the borrower typically "grants the lender, or entities to

---

[1] Plaintiff's deposition revealed a stunning lack of familiarity with any facts or legal basis for her claims.   When asked "[h]ave you ever seen [the Assignment] document before" – the document on which Plaintiff's entire Complaint is based – Plaintiff simply stated "I can't recall."   (J. Valrie Dep. 88:10-17).   Plaintiff admits that she has no damages and nothing changed before and after the Assignment. (J. Valrie Dep. 108:23-110:12).

[2] Citations to depositions and documents herein are as follows: Plaintiff's deposition, attached as **Exhibit A** (J. Valrie Dep.); deposition of Nationstar's Corporate Representative, Andrew J. Loll, attached as **Exhibit B** (Loll Dep.); affidavit of Amy Fleitas, default manager at GMAC Mortgage, LLC, attached as **Exhibit C** (Fleitas Aff.), declaration of Fannie Mae's corporate representative, Bryan Camilli, attached as **Exhibit D** (Camilli Decl.); Nationstar's expert witness Laura Borrelli's report, attached as **Exhibit E** (Borrelli Rep.); declaration of Andrew J. Loll, attached as **Exhibit F** (Loll Decl.); relevant portions of Plaintiff's responses to Nationstar's Requests for Admission, attached as **Exhibit G**.

whom the lender has sold the loan…interests such as the right to foreclose on the property in the event that the borrower defaults…" (Borrelli Rep. at 5).[3]

2.      On July 29, 2003, Plaintiff received a loan (the "Loan") from Homecomings Financial Network, Inc. ("Homecomings") and, in connection with that Loan, executed a note (the "Note") and a mortgage (the "Mortgage") (J. Valrie Dep. 21:5-8, 46:16-19; J. Valrie Dep. Ex. 5; Fleitas Aff. at ¶ 6; Ex. G at ¶ 1).   The Mortgage secured repayment of the Loan on property located at 2270 Annwood Drive, Mobile, Alabama 36605 (the "Property"). (J. Valrie Dep. Ex. 4; Fleitas Aff. at ¶ 7; Ex. G at ¶ 2; Loll Dep. 69:19-70:2).

3.      In the Mortgage, MERS is named as the "mortgagee," "**acting solely as a nominee for Lender and Lender's successors and assigns**."  (J. Valrie Dep. Ex. 4, Ex. G at ¶ 3; Loll Dep. 68:6-15; J. Valrie Dep. 39:3-10) (emphasis added).   While MERS is referenced in the Mortgage, there is no reference whatsoever to MERS in the Note.   (J. Valrie Dep. Ex. 5; J. Valrie Dep. 55:16-18; Loll Dep. 70:14-22 & 83:21-25; Borrelli Rep. at 6).

<u>Fannie Mae has Owned the Loan Since 2003</u>

4.      At some point after origination, the Note was endorsed and sold to GMAC Mortgage Corporation ("GMACM").   (J. Valrie Dep. Ex. 5; J. Valrie Dep. 48: 14-17; Loll Dep. 87:14-15).   As a result, GMACM became owner of the Loan with the right to collect payments due under the Note.   (J. Valrie Dep. Ex. 5, at ¶ 1)

5.      On or about September 9, 2003, GMACM sold the Loan to Fannie Mae.   (Fleitas Aff. at ¶ 9; Camilli Decl. at ¶ 4; Borrelli Rep. at 11; Loll Decl. Ex. 12; J. Valrie Dep. 31:3-10).   Since September 2003, and through today, *Fannie Mae has had continuous, uninterrupted ownership of the Loan*.   (Camilli Decl. at ¶ 6 & Ex. 1; Borrelli Rep. at 9-14; Loll Dep. 16:3-8,

---

[3] For the Court's reference, Nationstar has attached the expert report of Laura J. Borrelli in its entirety to this memorandum as **Exhibit E.**  This report contains an extensive discussion of the history of MERS' and MERS' role in the mortgage industry.

20:5-11, Loll Decl. Exs. 12 & 13).  Plaintiff admitted that she has no reason to doubt Fannie Mae

owns the Loan.  (J. Valrie Dep. 76:11-14).

Nationstar has Serviced the Loan for Fannie Mae Since 2008

6.      While ownership of the Loan has remained constant since 2003, the Loan's

servicer has changed.[4]  On or about August 1, 2003, GMACM became the servicer of the Loan.

(Fleitas Aff. at ¶ 8; Loll Decl. Exs. 12 & 14).  Although GMACM's acquisition of servicing

rights pre-dated Fannie Mae's ownership of the Loan, once Fannie Mae purchased the Loan,

GMACM remained the servicer for Fannie Mae until on or about December 31, 2008.  (Fleitas

Aff. at ¶ 10; Loll Decl. Ex. 12).

7.      At that time, GMACM transferred servicing rights to the Loan to Nationstar.

(Fleitas Aff. at ¶ 11; Valrie Dep. 54:13–55:1; Loll Decl. Ex. 2 at NS/JV 426).  GMACM did not

transfer any ownership interest in the Loan to Nationstar because GMACM owned no such

interest to transfer.  (Fleitas Aff. at ¶ 12; Camilli Decl. at ¶ 6 & Ex. 1 (noting Fannie Mae's

ownership since 2003); Borrelli Rep. at 9 ("[T]he servicer is not the owner of the loan itself.")).

8.      Consequently, although Nationstar obtained servicing rights in late 2008, it did

not acquire any ownership interest in the Loan.  (Loll Dep. 16:4-8; Loll Decl. Ex. 12).  As Fannie

Mae's servicer, Nationstar performs a number of duties on Fannie Mae's behalf, such as:

ensuring taxes and insurance are paid on the secured property; collecting loan payments from

borrowers and remitting amounts due to Fannie Mae; responding to borrowers' inquiries

---

[4] "Generally, a loan "servicer" is responsible for all of the administrative functions related to a mortgage loan. These administrative functions include, but are not limited to tasks such as: collecting loan payments from the borrower; the accurate posting of payments; transmitting those payments to the loan's owner; maintaining escrow accounts and insuring the timely payment of real estate taxes; ensuring that adequate hazard insurance is maintained on the real property securing the loan; responding to the borrower's inquiries on the loan; maintaining Internal Revenue Service records regarding the interest paid on the loan; and, taking the requisite collection and loss mitigation actions (including foreclosure) to protect the loan owner's interest in the event of default."  (Borrelli Rep. at 10).  *See also*  28 U.S.C. 2605(i)(3).

regarding the loans; maintaining mortgage servicing and account records; and taking appropriate action to resolve or prevent delinquencies. (Fannie Mae 2012 Servicing Guide, Pt. I, ch. 2, § 202 *Servicer's Basic Duties and Responsibilities*, available at http://www.allregs.com/tpl/public /fnma_freesiteconv_tll. aspx) (the "Servicing Guide").[5]

9.      The Servicing Guide requires Nationstar to take prompt and prudent action to protect Fannie Mae's ownership interest in the loan when a borrower is delinquent on a Fannie Mae loan. (Loll Dep. 36:6-23; Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, *Foreclosures*; Borrelli Rep. at 13). This includes proceeding with foreclosure as required by the Servicing Guide. (Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, *Foreclosures*; Borrelli Rep. at 13).

<u>Plaintiff's Default and Modifications</u>

10.     At the time Nationstar acquired servicing rights to Plaintiff's Loan, Plaintiff was already delinquent on her Loan payments. (Loll Decl. Ex. 2 at NS/JV 426). As early as February 2, 2009, Nationstar reported Plaintiff's delinquency to Fannie Mae, which the Servicing Guide requires it to do for all delinquent loans owned by Fannie Mae. (Loll Decl. Ex. 2 at NS/JV 426; Fannie Mae 2010 Servicing Guide, Pt. VII, ch. 7, *Delinquency Status Reporting*; A.J. Loll Dep. 48:20-21).

---

[5] The Fannie Mae Servicing Guide is available at the website above. For ease of reading, Nationstar has only identified the website address once here. Fannie Mae updates the Servicing Guide relatively frequently, which has resulted in numerous versions of the guide being available online (e.g. 2012 Servicing Guide, 2011 Servicing Guide). Each version of the guide, however, does not consist of entirely new material. Rather, the Servicing Guide consists of sections that were updated and went into effect at different times. For example, the 2012 Servicing Guide contains some sections that went into effect in 2011 and other sections that went into effect in 2009. Every section of the Servicing Guide includes a date next to the section's title, representing the date on which that section became effective. This memorandum references the sections of the Servicing Guide that were in effect at the time of the assignment at issue, which can generally be found in the 2010 version of the Servicing Guide. The 2010 version, however, was only a partial update of the Servicing Guide and where sections applicable to this lawsuit are not contained in that version, this memorandum references 2012 Servicing Guide's instead. Relevant sections of the Servicing Guide are attached to the Loll Declaration as **<u>Exhibit 10.</u>**

11.     In addition to reporting Plaintiff's Loan as delinquent to Fannie Mae, Nationstar attempted numerous times to offer Plaintiff assistance to remedy her delinquency.  For example, Nationstar presented Plaintiff with various remedial options, including loan modifications and other repayment plans. (*See, e.g.*, J. Valrie Dep. Exs. 8 & 9; Loll Decl. Ex. 4).   These options included programs uniquely available to borrowers whose loans were owned by Fannie Mae. (Loll Decl. at ¶ 5).

12.     For example, on April 29, 2010, Nationstar sent Plaintiff a letter informing her that she may be eligible to qualify for an "Alternative Modification™" (or "Alt Mod™"), which are trademarks of Fannie Mae.  (J. Valrie Dep. Ex. 8; J. Valrie Dep. 74:18-75:14; Ex. G at ¶ 10). The letter informed Plaintiff that Alt Mod™ is a solution offered through Fannie Mae and that Fannie Mae was "the owner of [Plaintiff's] loan."  (J. Valrie Dep. Ex. 8; Valrie Dep. 74:18-75:18; Ex. G at ¶ 11).  Alt Mod™ is a program offered for loans owned by Fannie Mae (Borrelli Rep., at 12; Loll Decl. at ¶ 5), and servicers of Fannie Mae loans have been directed by Fannie Mae to consider offering the Alt Mod™ program to certain borrowers.  (Loll Decl. Ex. 11).

13.     Nationstar informed Plaintiff in August of 2010 that she may qualify for Fannie Mae's "HomeSaver Advance™" and "Deed-for-Lease™" programs. (J. Valrie Dep. Ex. 10; J. Valrie Dep. 80:13-83:8).  The HomeSaver Advance™ program is available for a "mortgage loan that is purchased or securitized by Fannie Mae…as well as any whole mortgage loan that is held in Fannie Mae's portfolio…."  (*See* Fannie Mae 2010 Servicing Guide, Pt. VII, ch. 6, § 609.01, *Eligibility Criteria*).  In fact, HomeSaver Advance™ is a trademark of Fannie Mae.  (J. Valrie Dep. 83:5-8; J. Valrie Dep. Ex. 10).  Similarly, only Fannie Mae loans are considered eligible for Deed-for-Lease™.  (*See* Fannie Mae 2010 Servicing Guide, Pt. VII, ch. 6, § 606.01.01,

*Eligibility*).  Deed-for-Lease™ is also a trademark of Fannie Mae.[6]  (J. Valrie Dep. 83:5-8; J. Valrie Dep. Ex. 10).

<u>Initiating Foreclosure Pursuant to Fannie Mae's Servicing Guide</u>

14.    The Servicing Guide provides that when a borrower is unable to make his or her mortgage payment, the servicer of a Fannie Mae loan must take action to protect Fannie Mae's investment.  (*See* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, *Foreclosures*; Borrelli Rep., at 13).  The loan modifications and other foreclosure alternatives had been unsuccessful in remedying Plaintiff's delinquency, therefore, Nationstar began preparing for foreclosure on the Property.  (*See generally* A.J. Loll Dep. 38:2–42:16 & 51:2–21; Loll Decl. Ex. 15).  These preparations included hiring the law firm of Sirote & Permutt for the express purpose of handling the foreclosure proceedings.  (*See* Loll. Dep. 60:2-15; Loll Decl. at ¶ 7 & Ex. 15).

15.    In initiating a foreclosure on a Fannie Mae loan, Nationstar is required to follow the Servicing Guide, which includes "Fannie Mae's *requirements* and procedures for conducting foreclosure proceedings."  (Borrelli Rep., at 10; Loll Dep. 16:9-21, 51:16-21, 53:25-54:3, 71:14-72:6; Fannie Mae 2010 Servicing Guide, Pt. VIII,  *Introduction*).

16.    According to the Servicing Guide, when MERS is the mortgagee of record, as in the present case, "MERS must not be named as a plaintiff in any foreclosure action, whether judicial or non-judicial, on a mortgage loan owned or securitized by Fannie Mae."[7]  (*See* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings*).  In such a situation, Fannie Mae requires that "the servicer will need to prepare a mortgage assignment

---

[6] Alternative Modification™, HomeSaver Advance™, and Deed-for-Lease™ are unregistered trademarks of Fannie Mae.  *See* Fannie Mae, *Trademarks*, *available at* http://fanniemae.com/portal/trademarks.html.

[7] "MERS is the mortgagee of record when either a mortgage names MERS as the original mortgagee and is recorded in the applicable land records, or a completed and recorded assignment names MERS as the mortgage assignee."  (*See* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings*).

from MERS to the servicer, and then bring the foreclosure in its own name, unless Fannie Mae specifically requires that the foreclosure be brought in the name of Fannie Mae."  (*Id.*; Borrelli Rep., at 13; Loll Dep. 74:11-14).

17.     The Servicing Guide expressly states that "Fannie Mae is at *all times the owner* of the mortgage note."  (*See* Fannie Mae 2012 Servicing Guide, Pt. I, ch. 2, § 202.07.01, *Ownership and Possession of Note by Fannie Mae*) (emphasis added).  The Servicing Guide further states that "[t]he servicer may *never* be identified as the 'owner' of the note that is the subject of the foreclosure action."  (*See* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings*) (emphasis added).

18.     As a servicer for Fannie Mae, Nationstar's conduct in initiating foreclosure on the Property expressly tracked the steps established by Fannie Mae in the following ways:

(1) As the mortgagee of record, MERS assigned the Mortgage to Nationstar for the purpose of initiating foreclosure.  (*See* J. Valrie Dep. Ex. 11; Loll Decl. ¶ 4; Borrelli Rep. 13, 17; Loll Dep. 53:13-54:3, 55:9-56:4, 59:6-60:3, 70:23-71:6, 71:14-72:6). Foreclosure counsel prepared the Assignment.  (Loll Dep. 60:2-9).

(2) Foreclosure counsel sent Plaintiff a letter informing her that a foreclosure sale was scheduled for November 8, 2010.  (Loll Decl. Ex. 15).  This letter included an attachment entitled "Mortgage Foreclosure Sale."  Pursuant to the Servicing Guide, this attachment listed Nationstar only as a "Mortgagee/Transferee."  (Loll Decl. Ex. 15; s*ee* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings* (stating that the server may be identified as the mortgagee)).

(3) As required by the Servicing Guide, both before and after the Assignment, Nationstar never represented itself as the owner of Plaintiff's Loan.  (*See* Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings* ("The servicer may never be identified as the "owner" of the note that is the subject of the foreclosure action.")).

(4) Nationstar did not initiate foreclosure in the name of Fannie Mae but, rather, stated that Nationstar was Mortgagee/Transferee.  (Loll Decl. Ex. 15; Loll Dep. 100:15-23; Borrelli Rep., at 15; Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, § 105, *Conduct of Foreclosure Proceedings*).

<u>Fannie Mae Remained the Owner of Plaintiff's Loan After the Assignment</u>

19.     Nationstar never received any rights to the indebtedness outside of its right to enforce the Loan on behalf of Fannie Mae.  (Loll Dep. 20:5-11; Borrelli Rep., at 9-14).  Fannie Mae owned the Loan and the Note at all times since September 9, 2003.  (Camilli Decl. at ¶ 6 & Ex. 1).  Since Nationstar never received an interest in the indebtedness from the Assignment, Nationstar's actions post-Assignment remained consistent as a servicer for Fannie Mae, rather than an owner of the Loan.

20.     After the Assignment, Nationstar continued to inform Fannie Mae that Plaintiff's Loan was delinquent.  For example, on October 4, 2010, Nationstar's Collection History Profile for Plaintiff's Loan states "Loan Reported to FNMA as delinquent."  Similarly, the entry for January 10, 2011 states "FNMA Loan" and "Loan Reported to FNMA as delinquent."  (*See* Loll Decl. Ex. 2 at NS/JV 468 & 476; J. Valrie Dep. 94:11-19, 95:15-21; Borrelli Rep., at 13-14).

21.     Nationstar also continued to inform Plaintiff that she may be eligible for loss mitigation and loan modification options designed for borrowers whose loans are owned by Fannie Mae.  For example, Nationstar sent Plaintiff four letters, dated September 24, 2010, October 26, 2010, November 27, 2010, and December 28, 2010 respectively, which all informed Plaintiff that she may be eligible for the "Deed-for-Lease™" program – a program available for borrowers on Fannie Mae mortgage loans. (Loll. Decl. Exs. 5, 7-9).

22.     Plaintiff admits that Nationstar's letters to her discussing loan modifications and loss mitigation did not change after the Assignment, and that both before and after the Assignment, Nationstar discussed with Plaintiff modification programs offered through Fannie Mae.  (J. Valrie Dep. 102:1-104:19).  Additionally, as late as December 28, 2011, Nationstar was attempting to modify Plaintiff's Loan through a Fannie Mae program called "Apollo."  (*See* Borrelli Rep., at 14; Loll Decl. Ex. 2 at NS/JV 480 (dated September 26, 2011 and noting that

documents were still needed in order to assess "FNMA Modification"); Loll Decl. Ex. 2 at NS/JV 482 (containing an entry dated December 21, 2011 referencing a "FNMA Mod" and an entry dated January 4, 2012 referring to "Apollo").

23.　The manner in which Plaintiff made her Loan payments also did not change after the Assignment.  Before the Assignment, Plaintiff made her Loan checks payable to Nationstar Mortgage Co.  (J. Valrie Dep. 97:19-98:1 & Ex. 13).  Similarly, after the Assignment, Plaintiff also made her Loan checks payable to Nationstar Mortgage Co.  (J. Valrie Dep. 99:5-9 & Ex. 13).  Plaintiff admits that she continued writing checks to Nationstar after the Assignment as she did before the Assignment.  (*See* J. Valrie Dep. 100:12-16 & Ex. 13; Ex. G at ¶ 7).

24.　Nationstar went so far as to inform Plaintiff, after she received the notice of foreclosure, that Fannie Mae owned her loan.  (J. Valrie Dep. 31:4-33:10).

25.　Despite the execution of the Assignment for the purpose of foreclosure, foreclosure has never taken place.  (J. Valrie 29:21-22).  Plaintiff admits that she has not been damaged by Nationstar's alleged failure to provide her with a section 1641(g) notice.  (J. Valrie Dep. 108:23-110:12).

## STANDARD OF REVIEW

The Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "If the moving party meets [its burden of production], 'the nonmoving party must present evidence beyond the pleadings showing that a reasonable jury could find in its favor.'"  *Shiver v. Certoff*, 549 F.3d 1342, 1343 (11th Cir. 2008) (citations omitted). Importantly, "[s]peculation does not create a genuine issue of fact of fact."  *Id.* (citations omitted).  Nor does a "mere 'scintilla' of evidence supporting the opposing party's position" suffice.  *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting *Anderson v. Liberty*

*Lobby*, 477 U.S. 242 (1986)).  If all an opposing party offers is evidence that is "'merely colorable' or 'not significantly probative,'" summary judgment should be granted in favor of the movant.  *Botes v. Weintraub*, No. 11-11711, 2012 U.S. App. LEXIS 6436, at *8 (11th Cir. Mar. 30, 2012) (quoting *Anderson*, 477 U.S. at 249-50).

<u>A<span style="font-variant:small-caps">RGUMENT</span></u>

Section 1641(g), a 2009 amendment to TILA, generally requires that a borrower be notified when *ownership* of his or her mortgage *loan* has changed, thus resulting in a "new owner or assignee" of the loan.  Specifically, the section states:

**Notice of new creditor**

**(1)    In general**

In addition to other disclosures required by this subchapter, not later than 30 days after the date on which a *mortgage loan*  is sold or otherwise transferred or assigned to a third party, the *creditor that is the new owner or assignee of the debt* shall notify the borrower in writing of such transfer….

15 U.S.C. § 1641(g) (emphasis added).  By its plain terms, § 1641(g) only applies when ownership of a *loan* has been transferred, not to the transfer of the *mortgage* securing the loan.[8]

---

[8] Although § 1641(g) focuses exclusively on transfers of *ownership*, portions of Regulation Z, which are regulations promulgated by the Federal Reserve Board to implement § 1641(g), use the phrase "legal title" when discussing transfers that trigger § 1641(g) obligations.  12 C.F.R. § 1026.39(a)(1).  Despite the change in phrasing, there is no indication that the use of "legal title" was intended to minimize the interests which, when transferred, trigger § 1641(g).  In drafting § 1641(g), Congress "intended to provide consumers with information about the identity of the *owner of their mortgage loan*."  *See* 75 Fed. Reg. 58489, 58489 (Sept. 24, 2010) (Final Rule, Publication Commentary).  As a result, the phrase "legal title" must be interpreted in light of § 1641(g)'s focus on a transfer of *ownership* as the trigger for § 1641(g) obligations because, to be valid, an agency's interpretation of a statute must comport with the congressional intent behind the provision.  *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.").

In other cases, Plaintiff's counsel has argued that the use of the term "legal title" indicates that any transfer of "apparent ownership" triggers § 1641(g).  That contention fails because, as courts have recognized, if Congress had intended the word "owner" to mean something less than the absolute ownership, such as "apparent ownership," it was capable of articulating such a

*See*, *e.g.*, *Jara v. Aurora Loan Servs.*, No. C 11-00419 LB, 2012 U.S. Dist. LEXIS 45532, at \*12 (N.D. Cal. Mar. 30, 2012) ("15 U.S.C. § 1641(g) only applies to creditors who are new owners or assignees of mortgage loan."); *Trang Che v. Aurora Loan Servs., LLC*, No. SACV 11-01458-CJC, 2012 U.S. Dist. LEXIS 51642, at \*8-9 (C.D. Cal. Mar. 15, 2012) (recognizing that § 1641(g) is *only* triggered ownership of a mortgage loan).

In the present case, Nationstar owed no § 1641(g) obligations to Plaintiff because Nationstar never acquired ownership of Plaintiff's Loan through the Assignment or otherwise. As discussed below, MERS never had any interest in the *loan* that it could pass to Nationstar through the Assignment. Consequently, despite the inartful language in the Assignment referring to the "indebtedness," it was factually and legally impossible for MERS to transfer such an interest to Nationstar. MERS had no ownership interest. Instead, Plaintiff's Loan has been owned continuously by Fannie Mae since 2003 and there is **no evidence** of any transfer of Fannie Mae's interest to Nationstar. In fact, all of the evidence produced in this case is consistent with Nationstar acting *only* as the Loan's servicer since late 2008, on behalf of the Loan's owner, Fannie Mae. What's more, even if Nationstar had acquired an ownership interest in Plaintiff's Loan, which it did not, TILA provides a safe harbor for servicers who acquire loans for the administrative convenience of servicing the obligation. It is indisputable that the Assignment to Nationstar was executed for the purpose of initiating foreclosure on Plaintiff's Property and, therefore, had the Assignment transferred the Loan, it would be the quintessential

---

position. *See City of L.A. v. San Pedro Boat Works*, 635 F.3d 440, 451 (9th Cir. 2011) (noting, in the context of federal CERCLA regulation, that if Congress had intended the term "owner" to mean something other than the "absolute owner," "the least it could do is speak clearly"). In fact, in other legislative schemes, Congress has done just that. *See, e.g.*, 26 U.S.C. § 2042(2) (noting that life insurance proceeds can be calculated as part of a decedent's gross estate if at the time of death the decedent possessed "incidents of ownership").

example of the type of transfer falling within the safe harbor.  As a result, Nationstar's Motion for Summary Judgment should be granted.

## A.  __The Assignment Transferred MERS' Interest in the Mortgage to Nationstar__

Plaintiff alleges that MERS assigned an interest in the indebtedness to Plaintiff through the Assignment. (Compl. ¶ 6).  However, MERS could not transfer any interest in the indebtedness to Nationstar as a matter of law because MERS did not own such an interest. Rather, as is typical in the mortgage industry, the Assignment simply transferred MERS' interest in Plaintiff's *mortgage* so that Nationstar could initiate foreclosure proceedings on behalf of Fannie Mae.  (Borrelli Rep. at 16).  Such a transfer does not trigger § 1641(g).

It is well-settled under Alabama law that a party may not assign more rights than it possesses.  *Mannsfeld v. Evonik Degussa Corp.*, 2011 U.S. Dist. LEXIS 1412, *58 (S.D. Ala. Jan. 5, 2011) (ruling "[assignor] could not assign to [assignee] a greater interest in [the] inventions than [assignor] itself possessed"); *LPP Mortgage, Ltd. v. Boutwell*, 36 S.3d 497, 503 (Ala. 2009) ("Alabama law is long settled that an assignee stands in the shoes of the assignor."); *Singer Asset Finance Co. v. Connecticut General Life Ins. Co.*, 975 So. 2d 375, 380 (Ala. Civ. App. 2007) ("When a party assigns its rights under a contract to an assignee, the assignee steps into the shoes of the assignor and possesses all the rights the assignor originally possessed but nothing more.").  Therefore, Nationstar could receive from MERS no more than what MERS itself possessed.  To understand what MERS possessed with respect to Plaintiff's Mortgage and Note, one must understand the genesis of MERS and its role in the modern mortgage industry.[9]

---

[9] The discussion below provides an overview of MERS.  For a much more thorough discussion, please see Ms. Borrelli's expert report attached hereto as __Exhibit E__.

1.     <u>MERS' Facilitates the Transfer of Mortgage Loans, it Does not own Loans Itself</u>

When a borrower takes out a home loan, the borrower typically executes a promissory note evidencing the underlying debt and a security instrument (a mortgage in Alabama) that secures repayment of that debt.  *See generally* SOF ¶ 1; Borelli Rep., at 5-6; *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1039 (9th Cir. 2011).  Generally, the security instrument is recorded in the land records of the county where the property is located.  Originators of mortgage loans, however, generally do not keep the loans on their books and records for the duration of the loan's lifetime.  Loans, and the right to receive payments on such loans, are often sold to investors and other third-party purchasers.  *See generally* Borrelli Rep. at 6.  As a general rule, "[w]hen a mortgage secured loan is sold or traded to a third party, the rights in the security instrument, and the ability to use that security instrument to enforce the loan, also transfers with the note to that third party purchaser."  (Borrelli Rep. at 6).  When such a sale occurs, in order to reflect the change in the secured party, an assignment of the security instrument associated with the loan is often recorded in the real property records of the locality where the land is located.  *See Cervantes*, 656 F. 3d at 1039; Borrelli Rep., at 6.  Toward the end of the 20th century, the origination and subsequent selling of mortgage loans began to accelerate, leading to an increased need to record and re-record the accompanying transfer of the security instruments securing those loans.  (Borrelli Rep. at 6).  This constant need to record and re-record the security instruments grew cumbersome and overwhelming for local clerks' offices.  *See Cervantes*, 656 F. 3d at 1039; Borrelli Rep. at 6-7.  To make the process of selling mortgage loans more efficient, MERS was developed.

MERS accomplishes this goal in at least two ways.  First, it maintains an electronic database which internally tracks the transfer of mortgage loans – keeping an electronic record of the entity that owns the mortgage loan and the entity that services the mortgage loan at any given

time.  *See, e.g.* Loll Decl. Ex. 13.  *See also* Borrelli Rep., at 7.  Second, MERS often serves as the "mortgagee" in order to minimize the need for constant recordation of security instruments when loans are sold.  (Borrelli Rep., at 7).  Mortgages like the one in the present case designate MERS as a "nominee" for the lender and the lender's "successors and assigns" with the ability to exercise the interests in the security instrument, including the right to foreclose and sell the property in the event of default.  (J. Valrie Dep. Ex. 4).  In this capacity, MERS is acting as the mortgagee for the loan's owner – whoever that may be.  (Borrelli Rep., at 7).  If the loan's owner were to sell the loan to a third party in the MERS system, MERS would continue to act as mortgagee on the new owner's behalf (i.e. the lender's successor or assignee).  (Borrelli Rep. at 7).  "In such a transaction, even though the loan was sold, since MERS at all times remained the mortgagee of record, there is no need to re-record any transfer of the mortgage in the local land records, the ownership records are maintained electronically."  (Borrelli Rep. at 8).  By reducing the need to constantly record and re-record the accompanying security instrument, MERS makes the sale of mortgage loans much more efficient.

While MERS *tracks* the ownership of mortgage loans and often serves as the mortgagee of record to facilitate the transfer of loans, MERS does not own the loans itself.  "MERS is not involved in originating the loan, *does not have any right to payments on the loan*, and does not service the loan."  *Cervantes*, 656 F.3d at 1039-1040 (emphasis added).  "MERS does not have any financial interest in the loan itself."  (Borrelli Rep. at 8).  This conclusion is consistent with the myriad of judicial opinions and an overwhelming number of additional authorities addressing MERS' role in the mortgage market.  *See, e.g. Mortgage Elec. Registration Sys. v. Estrella*, 390 F.3d 523, 525 (7th Cir. 2004) ("[MERS] is a nominee only, holding title to the mortgage but not the note."); *McCann v. U.S. Bank, N.A.*, No. 11-CV-14804, 2012 U.S. Dist. LEXIS 72990, at *21

(E.D. Mich. Apr. 3, 2012) ("MERS was the 'mortgagee' and the Lender Ownit's 'nominee for Lender and Lender's assigns,' but since MERS had no interest in the promissory note, Defendant acquired no interest in the promissory note."); *Ward v. Sec. Atl. Mortg. Elec. Registration Sys.*, No. 5:10cv119, 2012 U.S. Dist. LEXIS 35380, at *14 (E.D.N.C. Mar. 14, 2012) ("In other words, a promissory note does not confer any rights on MERS nor does it name MERS as a party to the note."); *Culhane v. Aurora Loan Servs.*, No. 11-11098-WGY, 2011 U.S. Dist. LEXIS 136112, at *45 (D. Mass. Nov. 28, 2011) ("MERS readily concedes that it *does not own mortgage loans* and 'has *no rights whatsoever to any payments made on account of such mortgage loans….*'") (emphasis added) (internal citations omitted); *In re Marron*, 455 B.R. 1, 4 (Bankr. D. Mass. 2011) ("MERS does not own any of the mortgage loans associated with the mortgages registered in its system and is not entitled to receive payments from borrowers."); Allen H. Jones*, Setting the Record Straight on MERS,* Mortgage Banking 34 (May 2011) (stating that MERS holds the mortgage in trust on behalf of its member – the owner of the note); *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U. Cin. L. Rev. 1359, 1373 (2010) ("Everyone agrees that MERS is never entitled to receive a borrower's monthly payments, nor is MERS entitled to receive the proceeds of a foreclosure or deed of trust sale.  MERS has no actual financial interest in any mortgage loan."); MERS Terms & Conditions ("MERS shall have no rights whatsoever to any payments made on account of MERSLoans, Inc….") (attached as Exhibit 16 to the Loll Decl.).

  2. <u>Consistent with MERS' Role as Mortgagee, MERS did not own Plaintiff's Loan</u>

  MERS' role in Plaintiff's Loan is consistent with MERS' well-established role as an entity that serves as mortgagee, but does not own any interest in the loan secured by the mortgage.  (*See* Borrelli Rep. at 8 – 9).  In fact, Plaintiff has not produced even a scintilla of evidence showing that MERS owned any portion of her Loan.  During Plaintiff's deposition, she

was asked if she "kn[ew] of any facts indicating that MERS has any ownership interest in her loan." (J. Valrie. Dep. 44:4-6). She responded simply, "No, sir." (J. Valrie Dep. 44:7). This admission is corroborated by the additional documents regarding MERS produced in discovery.

The only reference to MERS in Plaintiff's mortgage documents is found in Plaintiff's *Mortgage*, not in Plaintiff's Note – a fact Plaintiff readily admits. (*See* J. Valrie Dep. 55:16-18 (answering "No" when asked "So there's nowhere in there that you see MERS identified in the note?"); SOF ¶ 3). In the Mortgage, MERS is identified as solely the "nominee for Lender and Lender's successors and assigns" and as "the mortgagee under th[e] Security Instrument." (J. Valrie Dep. Ex. 4; SOF ¶ 3). In that capacity, "MERS holds only legal title to the interests granted by [Plaintiff] in th[e] *Security Instrument*." (J. Valrie Dep. Ex. 4; SOF ¶ 3) (emphasis added). The *security* instrument and the *Note* are separate legal documents. Simply because MERS was granted an interest in the security instrument does not mean that MERS has any interest whatsoever in Plaintiff's Note, or the Loan it evidences. Numerous courts have reached this same conclusion. *See, e.g. Ward*, 2012 U.S. Dist LEXIS 35380, at *14 (stating that "MERS' rights are defined solely by the deed of trust," these "rights and duties under the deed of trust are limited" and "a promissory note does not confer any rights on MERS nor does it name MERS as a party to the note"); *In re Fitch*, No. 04-16905, 2009 Bankr. LEXIS 1375, at *7 (N.D. Ohio May 28, 2009) ("A fundamental part of this system is that MERS holds mortgages as nominee for other named parties. MERS does not originate consumer loans and is not an original party to notes secured by mortgages on residences.").

Moreover, MERS never acquired an interest in the Loan after origination. According to the Note, the original lender was Homecomings. (J. Valrie. Dep. Ex. 5; SOF ¶ 2). Subsequently, the Note was endorsed to GMACM, who eventually endorsed it in blank and sold the Loan to

Fannie Mae. (J. Valrie Dep. Ex. 5, SOF ¶¶ 4-5). Fannie Mae has been the owner of the Loan with the right to receive the payments on the indebtedness from 2003 to the present day. (SOF ¶ 5). Plaintiff can point to no evidence showing that MERS had any ownership interest in the Note, or the Loan it evidences, because no such evidence ever existed. (*See also* Borrelli Rep. at 9 ("I conclude that MERS did not hold an ownership interest in Valrie's note (or loan) and that ownership of the Valrie note was not transferred to Nationstar through the Assignment of Deed of Trust."); Loll. Dep. 70:19-22 ("So any rights that MERS is stating on [the Mortgage] are only those rights contained within the mortgage and not the notes since MERS does not have the interest in the note.")). MERS was not the owner of the Loan at the time the Assignment was executed, and has never been the owner of the Loan.

3.   <u>MERS Cannot Transfer what it Does not Have</u>

Because MERS never owned the Loan, it could not have transferred ownership of the Loan to Nationstar. Therefore, Nationstar had no notice obligations under § 1641(g). Very recently, in *Knowles v. HSBC Bank USA*, No. CV-11-J-1953-S, 2012 U.S. Dist. LEXIS 79865 (N.D. Ala. June 8, 2012)*,* the district court for the Northern District of Alabama granted the defendant's motion for summary judgment on the plaintiff's § 1641(g) claim on this precise point. In that case, the plaintiff brought a claim against HSBC Bank USA under § 1641(g) for a failure to notify the plaintiff of the transfer of the mortgage loan at issue. *Id.* at *1. The claim was based on an "Assignment of Mortgage" from Sand Canyon Corporation to HSBC Bank USA, prepared in preparation for foreclosure proceedings. *Id.* at *5. The court concluded that the assignment document could not have triggered an obligation under § 1641(g) because, at the time of the assignment, Sand Canyon did not have any interests to assign. *Id.* at *15. According to the court, Sand Canyon "*could only assign whatever interest it still had in the mortgage and note, if any.*" *Id.* (emphasis added). The court reasoned that it had "no evidence before it that as

of May 9, 2011, Sand Canyon had any interest left to assign," and "no evidence before it that any transfer in ownership of the right to collect on the Note as secured by the mortgage occurred on May 9, 2011, and no notice under TILA was therefore due to plaintiff at that time."   *Id.* Therefore, the court granted summary judgment for defendants on the plaintiff's § 1641(g).

Similarly, the undisputed facts and established law show that MERS did not possess an interest in the Loan to assign to Nationstar.   As recognized in *Knowles*, an entity cannot assign that which it does not have, despite a recitation to the contrary.   *Id.* at *15.   *See also WMC Mortg. LLC v. Baker*, No. 10-3118, 2012 U.S. Dist. LEXIS 25765, at *28 (E.D. Pa. Feb. 28, 2012) (stating that "…the Note itself does not mention MERS. Nor is there any evidence the Note was ever assigned to MERS. In the absence of such evidence, any purported assignment of the Note by MERS would be ineffective"); *In re Box*, No. 10-20086, 2010 Bankr. LEXIS 1637, at *12 (Bankr. W.D. Mo. June 3, 2010) ("MERS was not named in any capacity in the Note, and there was no evidence that it otherwise had the authority to assign the Note. Consequently, because MERS has not demonstrated that it had the authority to assign the Note, its statement on the Deed of Trust Assignment purporting to do so could not be effective.").   Here, Nationstar received no interest in the Loan via the Assignment, or at any other time.   Therefore, Nationstar had no obligations to Plaintiff under § 1641(g).[10]

---

[10] Nor does the language in the Assignment, referencing the "indebtedness," create a *genuine* issue of material fact precluding the entry of summary judgment in favor of Nationstar.  Plaintiff has presented no evidence that MERS and/or Nationstar ever owned any interest in her Loan to contradict Nationstar's unambiguous facts that Fannie Mae has owned the Loan since 2003.  *See, e.g.*, *Bradley Outdoor, Inc. v. Colonial Bank*, 952 So. 2d 359 (Ala. 2006) (affirming summary judgment because there was no *genuine* dispute as to material fact regarding legal title to property, despite the introduction of unsupported documents which "might seem to create a genuine issue of fact" as to who had title to the property).

**B.**   **Fannie Mae has Owned Plaintiff's Loan Exclusively Since 2003**

Fannie Mae has been the owner of Plaintiff's Loan since 2003 and ownership has never been transferred to Nationstar.   This conclusion is made apparent by the primary Loan documents as well as the declaration of Bryan Camilli, an Assistant Vice President within Servicing Portfolio Management at Fannie Mae.   (*See*   SOF ¶¶ 3-5; Camilli Decl. ¶ 5 ("Fannie Mae has had continuous, uninterrupted ownership of the Loan from September 2003 through today.")).   This understanding of Fannie Mae's ownership was also confirmed by each individual questioned on the topic during discovery.   In Plaintiff's deposition, she was asked plainly, "[d]o you have any reason to doubt that when Nationstar tells you that Fannie Mae owns the loan, that that's not accurate."   Knowing of no facts to deny this question, Plaintiff simply stated "No."   (J. Valrie Dep. 76:11-14).[11]   Similarly, during the deposition of Nationstar's representative, the following exchange took place:

> **Question**: This is a -- a Fannie Mae loan?
> **Answer**: Correct.
> **Question**: Okay. And was Nationstar servicing it for Fannie Mae?
> **Answer**: Correct

(Loll Dep. 16:3-8).   Nationstar's representative further stated, "[a]nd in this particular case, as we were only directed as the servicer for Fannie Mae and never -- never did we actually own the

---

[11] Not only was Plaintiff unable to point to any evidence raising a genuine issue of fact as to whether Fannie Mae owned her Loan, during discovery Plaintiff affirmatively avoided making even the slightest effort to ascertain whether, in fact, Fannie Mae owned her Loan.   In Request for Admissions 19 – 21, Nationstar requested Plaintiff (1) admit that the "Fannie Mae Loan Lookup" tool, available online, can assist borrowers in determining if Fannie Mae owns their loan; (2) admit that Plaintiff is capable of entering her property address in that tool; and, (3) admit that the tool indicates that her Loan is owned by Fannie Mae.   Amazingly, Plaintiff refused to admit that she was capable of entering her information into the website and, consequently, refused to ever investigate the information contained in the tool regarding her Loan.   (Ex. G at ¶ 19-21).   During her deposition, Plaintiff was asked plainly, "did you ever try going on the website for Fannie Mae to plug in the information about your address or your loan to see if Fannie Mae owned it?"   In response, not only did she state "No," but she also admitted, despite her discovery response, that she was not aware that the tool was even available to her."   (J. Valrie Dep. 113:21-114:4).

note…that rule did not -- was not applicable to Nationstar because Nationstar never acquired the ownership rights to the note." (Loll Dep. 20:5-11). Moreover, Nationstar's expert drew the same conclusions after a thorough review of the documents in the case. According to Ms. Borrelli, "Nationstar does not, and has never, owned Valrie's note or loan." (Borelli Rep. at 9). "Rather, Nationstar's actions are entirely consistent with it being the servicer of the loan on behalf of the loan's owner, Fannie Mae." (*Id.*).

Given these undisputed material facts, the inescapable conclusion is that Nationstar has never owned Plaintiff's Loan. As a result, Nationstar was never *transferred* ownership of Plaintiff's Loan and never had an associated § 1641(g) obligation. Nationstar has, however, *serviced* Plaintiff's Loan on behalf of the Loan's owner, Fannie Mae. (SOF ¶¶ 8, 19).

## C.   Nationstar is Merely a Servicer of Plaintiff's Loan on Behalf of Fannie Mae, the Owner

According to TILA § 1641(f)(1), "[a] servicer of a consumer obligation arising from a consumer credit transaction shall *not be treated as an assignee of such obligation* for purposes of [§ 1641] *unless the servicer is or was the owner of the obligation*. 15 U.S.C. § 1641(f). Nationstar's conduct since 2008 belies Plaintiff's § 1641(g) allegations because it demonstrates: (1) that the owner of the Loan is actually Fannie Mae; and (2) that Nationstar was merely a servicer for Fannie Mae both before and after the Assignment, with no § 1641(g) obligations. *See* 15 U.S.C. § 1641(f)(1). The evidence proving this relationship among the parties begins almost from day one of Nationstar's servicing obligations, and continues well past the September 2010 Assignment.

At the time Nationstar acquired the servicing rights to Plaintiff's Loan, Plaintiff was already delinquent on her Loan. (SOF ¶ 10). As early as February 2009, Nationstar reported this delinquency to Fannie Mae. (SOF ¶ 10). Nationstar's updates of Plaintiff's delinquencies,

however, did not cease after the Assignment.  (SOF ¶ 20).  Nationstar's "Collection History Profile" for Plaintiff's Loan proves this point.  It contains an entry from October 4, 2010, nearly two weeks after the Assignment, which reads: "LOAN REPORTED TO FNMA AS DELINQUENT."  (SOF ¶ 20).  Similarly, the entry for January 10, 2011, nearly four months after the Assignment, reads: "FNMA LOAN" and "LOAN REPORTED TO FNMA AS DELINQUENT."  (SOF ¶ 20).  Nationstar was required to provide Fannie Mae with these updates as a condition of its *servicing* of a Fannie Mae owned Loan.  (SOF ¶ 10).  According to Nationstar's expert, Ms. Borrelli, "there would be no reason for Nationstar to inform Fannie Mae of Valrie's delinquency if Fannie Mae did not own the loan."  (Borrelli Rep. at 14).

The documents evidencing Nationstar's servicing on behalf Fannie Mae as owner are not limited to those providing Fannie Mae with updates regarding Plaintiff's delinquency. Throughout Nationstar's servicing relationship with Plaintiff, Nationstar attempted to work with Plaintiff, pursuant to the Servicing Guide, to remedy her delinquency.  To do this, Nationstar presented Plaintiff with a number of potential loan modification and loss mitigation solutions provided by Fannie Mae, both before and after the Assignment.

For example, Nationstar sent Plaintiff a letter on April 29, 2010 informing her that she may be eligible to qualify for an "Alternative Modification™," which was a program Fannie Mae directed its servicers to pursue.  (SOF ¶ 12).  In fact, this letter specifically informed Plaintiff that Fannie Mae was "the owner of [Plaintiff's] loan."  (SOF ¶ 12, J. Valrie Dep. Ex. 8). Later in the spring and summer of 2010, Nationstar offered Plaintiff two additional mitigation options - HomeSaver Advance™ and "Deed-for-Lease™ - which are also programs offered on Fannie Mae loans.  (SOF ¶ 13).  Similarly, after the Assignment, Nationstar continued to inform Plaintiff that she may be eligible for Fannie Mae-backed loss mitigation strategies, such as Deed-

for-Lease™ and "Apollo." (SOF ¶ 21). According to Ms. Borrelli, "[h]ad Fannie Mae no longer owned Valrie's loan at this time, Nationstar would have had no reason to inform Fannie Mae of Valrie's delinquency or pursue Fannie Mae loan modification options." (Borrelli Rep. at 14).

Nationstar also collected payments, as a servicer on behalf of Fannie Mae, both before and after the Assignment. As a servicer for Fannie Mae, one of Nationstar's tasks is the collection of Loan Payments. (SOF ¶ 8). Prior to the Assignment, Plaintiff made her Loan checks payable to Nationstar Mortgage Co. (SOF ¶ 23). Similarly, after the Assignment, Plaintiff made her Loan checks payable to the same entity. (SOF ¶ 23). In short, nothing with respect to Plaintiff's Loan payments, Nationstar's servicing of Plaintiff's Loan, or the modification options Plaintiff was offered, changed after the Assignment. (J. Valrie Dep. 108:19-22). This is strong evidence that the owner of Plaintiff's Loan never changed. In fact, the Assignment document on which Plaintiff appears to base much of her claim also supports the conclusion that Nationstar serviced the Loan on behalf of Fannie Mae.

1.      The Assignment was Solely for the Purpose of Initiating Foreclosure

"It is common practice in the mortgage industry for mortgages associated with delinquent loans to be assigned to the servicer in anticipation of the commencement of a foreclosure action." (Borrelli Rep. at 15; SOF ¶ 16). While there are many practical reasons for such an assignment, one of the more basic reasons is that Fannie Mae requires it when MERS is the mortgagee. (Borelli Rep. at 14). In the present case, the assignment from MERS to Nationstar, and Nationstar's conduct leading up to the foreclosure, demonstrate unequivocally that Nationstar was at all relevant times acting as *servicer* on behalf of the owner, Fannie Mae.

The Servicing Guide provides a blueprint for Nationstar's actions, which must be followed by Fannie Mae servicers. (SOF ¶ 15). According to the Servicing Guide, "[w]henever a borrower shows a disregard for the mortgage loan obligation or is unable to make the mortgage

payments, the servicer of a whole mortgage loan or a participation pool mortgage loan that Fannie Mae holds in its portfolio, or of an MBS mortgage loan serviced under the special servicing option, must protect Fannie Mae's investment by taking prudent action." (Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, *Foreclosures*). "Often, this 'prudent action' includes the commencement of a foreclosure." (Borrelli Rep. at 13; SOF ¶ 9).

In conducting a foreclosure where MERS is the mortgagee, as in the present case, Fannie Mae provides very specific guidance to servicers. According to Fannie Mae's servicing guide:

> MERS must not be named as a plaintiff in any foreclosure action, whether judicial or non-judicial, on a mortgage loan owned or securitized by Fannie Mae. MERS is the mortgagee of record when either a mortgage names MERS as the original mortgagee and is recorded in the applicable land records, or a completed and recorded assignment names MERS as the mortgage assignee. *Therefore, when MERS is the mortgagee of record, the servicer will need to prepare a mortgage assignment from MERS to the servicer, and then bring the foreclosure in its own name*, unless Fannie Mae specifically requires that the foreclosure be brought in the name of Fannie Mae.
>
> ***
>
> *The servicer may never be identified as the "owner" of the note that is the subject of the foreclosure action.* The servicer may be identified as the "holder" of the note upon receipt of actual or constructive possession of the note. *The servicer may also be identified as the mortgagee of the mortgage, or beneficiary of the deed of trust being foreclosed.*

(Fannie Mae 2010 Servicing Guide, Pt. VIII, ch. 1, *Foreclosures*). (emphasis added). When reading the Servicing Guide, and then comparing the directives contained therein to Nationstar's actions, it is apparent that Nationstar was acting at all times as the servicer for Fannie Mae.

The Servicing Guide requires that when MERS is the mortgagee of record, an assignment must be prepared for MERS to Nationstar. This is precisely what was done here. (SOF ¶ 18(1)). Second, the servicer must not bring the foreclosure in the name of Fannie Mae. Here, the notice of Mortgage Foreclosure Sale referred to Nationstar, but did not reference Fannie Mae. (SOF ¶ 18(2), (4)). Third, the Servicing Guide provides that the servicer may never be identified as the

"owner" of the Note.  Here, Nationstar never referred to itself as the owner.  (SOF ¶ 18(3)).  On the contrary, Nationstar informed Plaintiff that Fannie Mae owned the Loan.  (J. Valrie Dep. 31:4-33:10).  Fourth, the Servicing Guide states that the foreclosure notice may identify the servicer as the "mortgagee" of the mortgage.  Here, Nationstar referred to itself as the "Mortgagee/Transferree."  (SOF ¶¶ 18(2), (4), Loll Decl. Ex. 15).  As demonstrated above, Nationstar's actions were entirely consistent with the actions of a *servicer* taking direction from Fannie Mae, rather than as an owner of the Loan itself.

Similarly, in *Che v. Aurora Loan Services, LLC*, one of the only decisions to have addressed this issue on summary judgment, the court recently reached the same conclusion.  No. SACV 11-01458-CJC, 2012 U.S. Dist. LEXIS 51642 (C.D Cal. Mar. 15, 2012).  In *Che*, MERS held "legal title to the deed of trust" securing the plaintiff's loan.  *Id.* at *2.  The owner of the loan, however, was HSBC Bank, USA.  *Id.*  In preparation for foreclosure, the servicer was placed in possession of the original promissory note and an assignment of the Deed of Trust was completed from MERS to the servicer.  *Id.*  The plaintiff argued that the servicer obtained § 1641(g) obligations "when it obtained an assignment of her Deed of Trust and Promissory Note." *Id.* at *8.  The court disagreed.  Despite the assignment documents, the court held that the servicer "does not currently own [the plaintiff's] loan, and has never owned [the plaintiff's] loan."  *Id.* at *9.  The assignment, according to the court, "without [the servicer] owning her loan, is insufficient for liability under TILA."  *Id.*  As in *Che*, Nationstar was merely the servicer, not the owner of the Loan, and § 1641(g) does not apply.

**D.**     **Nationstar is Exempt from the Provisions of § 1641(g) because the Assignment was Solely for its Administrative Convenience**

Nationstar never became the "new owner or assignee of the debt" via the Assignment, but even if it had, the Assignment was solely for the administrative convenience of Nationstar in

servicing Plaintiff's Loan.  This type of transfer is expressly recognized exception to Section 1641(g).  According to 15 U.S.C. § 1641(f)(2):

> A servicer of a consumer obligation arising from a consumer credit transaction shall not be treated as the owner of the obligation for purposes of this section on the basis of an assignment of the obligation from the creditor or another assignee to the servicer solely for the administrative convenience of the servicer in servicing the obligation.

*See also* 75 Fed. Reg. 58489, at 58492 ("[T]he final rule does not apply to a party servicing the mortgage loan if the obligation was assigned to the servicer solely for administrative convenience."); *Ibarra v. Loan City*, No. 09-CV-02228, 2010 U.S. Dist. LEXIS 38775, at *8 (S.D. Cal. Apr. 20, 2010) ("The statute is clear that [the servicer] cannot be held liable under TILA if it is a servicer assigned the loan solely for administrative purposes.").

The Assignment in the present case was executed solely for the purpose of initiating foreclosure on the Property in accordance with Fannie Mae's guidance. (SOF 18(1)**;** Loll Decl. at ¶ 4).  Although the phrase "administrative convenience" is undefined in TILA, a "task performed for the administrative convenience of the servicer is one that makes it easier and more efficient for the servicer to fulfill its servicing obligations for the benefit of the loan owner." (Borrelli Rep. at 16).  The Assignment in the present case fits squarely within that category.

Nationstar's actions were required by the Servicing Guide.  As a loan servicer, Nationstar had a responsibility to take "prudent action" to protect Fannie Mae's investment in the face of repeated delinquency by Plaintiff.  (SOF ¶ 9).  Where, as in the present case, efforts to remedy the delinquency fail, such prudent action includes foreclosure.  (SOF ¶ 9)**.**  When a servicer initiates foreclosure on behalf of Fannie Mae, the Servicing Guide *requires* that the servicer to prepare a mortgage assignment from MERS to the servicer, and then bring the foreclosure in its own name.  (SOF ¶¶ 15-16).  The Assignment, therefore, was pursuant to the explicit directions provided by Fannie Mae to its servicers.  Not only did the Assignment make Nationstar's

servicing obligation more efficient, the Assignment *was* Nationstar's servicing obligation.  Such an action fits squarely in the letter of the administrative convenience exception.  *See also* Restatement (Third) of Property: Mortgages § 5.4(b) illus. 7 (emphasis added) (stating an assignment of the mortgage to the servicer "is *convenient* because it facilitates actions that the servicer might take, such as releasing the mortgage, at the instruction of the purchaser").

In addition to being required to take such action at the behest of Fannie Mae, the Assignment also makes it easier and more efficient for the Nationstar to fulfill its servicing obligation – foreclosure – for the loan owner's benefit.  The Assignment provided documentary evidence of Nationstar's authority to foreclose on behalf of Fannie Mae and "removed a potential cloud that could have existed over title to the property after foreclosure if Nationstar conducted the foreclosure, but MERS had remained the mortgagee."  (*See* Borrelli Rep. at 17).

Section 1641(g) obligations do not apply to "servicers that take title solely as an administrative convenience to enable them to service the loans."  75 Fed. Reg. 58489, 58499.  Even assuming title could have been transferred to Nationstar from MERS, it would be solely for the administrative convenience of Nationstar.  Plaintiff has failed to produce *any* evidence to the contrary and Nationstar is entitled to summary judgment.  According to Nationstar's industry expert, this is the quintessential example of a reasonable action performed solely for the administrative convenience of the servicer."  (Borrelli Rep. at 17).  *See also* National Consumer Law Center Comments to the Federal Reserve Board, *Requiring Notice to Consumers by Owners of Mortgage Loans*, at 4 ("A servicer would most likely take assignment for administrative convenience in order to prosecute a foreclosure in its own name rather than in the holder's name.") (attached as page 4 to Borrelli Rep. Ex. F).

**E.**    **Plaintiff's Failure to Allege an Actual Injury-in-Fact Deprives the Court of Article III Jurisdiction over the Complaint**

Although Plaintiff cannot recover her § 1641(g) claim because Nationstar never became the new owner of her Loan, Plaintiff's Complaint must be dismissed on a more elemental basis. Plaintiff's admission that she has not suffered any injury-in-fact strips the Court of subject matter jurisdiction.  Article III of the United States Constitution provides that the "judicial power" of the United States extends only to "cases" and "controversies."  U.S. Const. Art. III, § 2.  The Supreme Court enforces this case or controversy requirement by requiring that litigants have "standing to invoke the authority of a federal court."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citations omitted).  To have standing, a plaintiff must allege a "personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief."  *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  Here, Plaintiff admits that she has suffered no such injury traceable to any alleged §1641(g) violation.  (*See* SOF ¶ 25).

To satisfy the Article III standing requirements, an injury-in-fact must be "concrete in both a qualitative and temporal sense."  *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Importantly, a litigant does not develop an injury-in-fact in the Constitutional sense purely because Congress authorizes a plaintiff to bring a suit based on a statutory violation.  *See Raines v. Byrd,* 521 U.S. 811, 820 n.3 (1997) ("It is settled that Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").   "For 'although Congress may expand the definition of what constitutes an injury, essentially by expanding the list of rights people enjoy, it may not eliminate the constitutional case or controversy requirement.'"  *Morant v. Vaughn*, No. 2:08cv155, 2009 U.S. Dist. LEXIS 129417, at *10-11 (E.D. Va. Jan. 8, 2009) (citations omitted).  "The 'proper

analysis of standing focuses on whether plaintiff suffered an actual injury, not on whether a statute was violated.'" *Id.* at *11 (citations omitted).[12]

Here, as discussed above, Plaintiff has failed to allege an actual injury. While TILA may grant plaintiffs the right to recover statutory damages, it cannot supplant the Constitution's requirement of an injury-in-fact. Since Plaintiff has admitted that she has suffered no injury aside from the alleged violation of the statute itself, she has failed to present a case or controversy sufficient to invoke Article III jurisdiction. Therefore, the Complaint must be dismissed.

## CONCLUSION

For all of the reasons stated above, Nationstar respectfully requests the Court grant it summary judgment on Plaintiff's Complaint.

Respectfully submitted,

*/s/ J. Blair Newman*
EDWARD S. SLEDGE, III (SLEDE7917)
esledge@mcdowellknight.com
J. BLAIR NEWMAN, JR. (NEWMJ8590)
bnewman@mcdowellknight.com
*Attorneys for Nationstar Mortgage, LLC*

---

[12] Although the Supreme Court stated in *Warth v. Seldin,* 422 U.S. 490, 500 (1975), that "[t]he actual or threatened injury required by Art. III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing…,'" subsequent cases have shown that Article III standing is not solely a statutory question. As clarified by the Supreme Court in *Lujan*, the statement in *Warth* refers to "Congress' elevating to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law," not the creation of *de facto* injuries out of thin air. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 578 (1992) (emphasis in original). For Article III standing, there must exist *some injury-in-fact*, separate and apart from the injury ordained by Congress.

OF COUNSEL:

McDOWELL KNIGHT ROEDDER & SLEDGE, L.L.C.
Post Office Box 350
Mobile, Alabama 36601
Telephone: (251) 432-5300
Facsimile: (251) 432-5303

John C. Lynch (admitted *pro hac vice*)
Jason E. Manning (admitted *pro hac vice*)
TROUTMAN SANDERS LLP
222 Central Park Avenue, Suite 2000
Virginia Beach, VA  23462
Telephone:  (757) 687-7765
Facsimile:  (757) 687-1504
E-mail: john.lynch@troutmansanders.com
E-mail: jason.manning@troutmansanders.com
*Counsel for Nationstar Mortgage, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of July, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to the following CM/ECF participants:

Kenneth J. Riemer, Esq.
Earl P. Underwood, Jr., Esq.
Underwood & Riemer, P.C.
*Counsel for Plaintiff*
21 South Section Street
Fairhope, AL  36532
Telephone: (251) 990-5558
Facsimile: (251) 990-0626
Email: kjr@alaconsumerlaw.com
Email: epunderwood@alalaw.com

*/s/ J. Blair Newman*
J. Blair Newman

20041120v1

32